IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 14, 2018 Session

**STATE OF TENNESSEE v. CRYSTAL L. GREGOIRE**

**Appeal from the Circuit Court for Lawrence County**
**No. 33670     Russell Parkes, Judge**

_____

**No. M2017-01562-CCA-R3-CD**

_____

The Defendant, Crystal L. Gregoire, pled guilty in the Lawrence County Circuit Court to tampering with evidence and was convicted following a jury trial of first degree premeditated murder and sentenced to an effective term of life imprisonment.  On appeal, she challenges the sufficiency of the evidence of premeditation and argues that the trial court abused its discretion by excluding the testimony of a retired Federal Bureau of Investigation ("FBI") agent of the facts surrounding the victim's 1982 kidnapping convictions and the victim's having put out an "open contract" on the agent and the agent's family, by granting the State's request for a special jury instruction pertaining to the victim's having become "disarmed or helpless" during the killing, and by admitting prejudicial crime scene and autopsy photographs.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and NORMA MCGEE OGLE, J., joined.

Brandon E. White, Columbia, Tennessee (on appeal), and Robert H. Stovall, Jr., and Travis Jones, Pulaski, Tennessee (at trial), for the appellant, Crystal L. Gregoire.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Brent Cooper, District Attorney General; and Gary Howell and Christy Thompson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The 35-year-old Defendant and the 69-year-old victim, Sam John Passeralla, sold illegal prescription drugs together and were involved in a romantic relationship that ended on the night of May 18, 2015, when the Defendant killed the victim by beating him in the head with a hammer and cutting his throat with a knife. Afterwards, the Defendant attempted to clean the premises with a bleach-based cleanser, planted a kitchen knife in the victim's hands, and went home, where she buried the murder weapons, a latex glove, pill bottles belonging to the victim, and blood-stained clothing. The Defendant's 16-year-old son discovered the victim's body the next day and called 9-1-1. During the ensuing murder investigation, the Defendant misdirected investigators and eventually gave three separate, vastly different statements to police. In the final statement, she admitted that she beat and stabbed the Defendant in his bedroom but claimed that she acted in self-defense. She was subsequently indicted for first degree premeditated murder, first degree felony murder, theft, aggravated assault, and tampering with evidence. Before her trial began, the Defendant opted to plead guilty to tampering with evidence and the State dismissed the aggravated assault count of the indictment.

## Trial
## State's Proof

Johnny Cheatwood, Director of Lawrence County Emergency Communications, identified the 9-1-1 call that the Defendant's son, Josh Brown, made at 8:50 p.m. on May 19, 2015, upon his discovery of the victim's body.

Chief Terry Beecham of the Lawrenceburg Police Department, one of the first two officers to respond to the 9-1-1 call, testified that when he arrived at the victim's apartment, he found a semi-hysterical, weeping Josh Brown outside and the victim dead inside his apartment. He identified crime scene photographs that showed the victim on his bed, lying on his back in a pool of blood, the victim's walker beside the bed, and a candle that was burning on the victim's nightstand. He testified that although he had known the victim, he was unable to recognize him due to the damage that had been inflicted on his body. On cross-examination, he acknowledged that there were no windows in the victim's adjoining bathroom and only one entry/exit door from the apartment.

Investigator Tommy Goetz of the Twenty-Second Judicial District Attorney's Office testified that there was a bathroom on the right side of the room, a nightstand on the side of the bed nearest the bathroom, a chest of drawers on the opposite side of the bed, and a mirrored dresser at the foot of the bed with a path between the dresser and the bed. The victim, dressed in pajama bottoms and white socks, was lying on his back across the bed with his feet at the floor toward the bathroom and his head toward the chest of drawers. A white shirt was lying on the victim's shoulder next to his face, and a

bread knife, which appeared to have come from the knife block in the kitchen, was in the victim's right hand on top of his stomach.

Investigator Goetz testified that although he was not certified as an expert, he had extensive training in homicide investigations, which involved the use of blood spatter and blood sling evidence. He explained that blood spatter is what occurs when blood is cast from a body upon impact, and blood sling is what occurs when blood is cast from an object used to strike a victim. At the crime scene, there was a void, or lack of blood spatter or blood sling, in the area around the chest of drawers and the bedroom window, which indicated that the perpetrator was behind the victim. There was no blood spatter on the bread knife, which indicated that it had been placed in the victim's hand after his death.

When Investigator Goetz exited the apartment, the Defendant was outside standing beside a police car in which her son was sitting. On May 21, Investigator Goetz and Special Agent Wayne Wesson of the Tennessee Bureau of Investigation ("TBI") interviewed the Defendant at her home. Based on the information she provided, they returned to the victim's apartment, where they uncovered a manila envelope containing TBI discovery documents in the case of an individual who had been arrested on drug charges, and which named the victim as one of the individuals to whom he supplied drugs. According to Investigator Goetz, the documents

> named [the victim] as giving marijuana, several pounds a week. And that he thought he had determined who the snitch was and he had approached an individual. And so [the Defendant] was leading us to believe that [the victim] was possibly killed over these discovery papers.

Investigator Goetz testified that they followed up on the lead and interviewed the "snitch," but it led nowhere. On cross-examination, he acknowledged that the discovery documents included a signed statement of David Dover, also known as "Daisy Dover," in which he stated that he imported marijuana from Mexico and sold ten or twelve pounds of it per week to the victim.

Investigator Goetz conceded that the victim had such a close relationship with the Defendant and her son that Mr. Brown referred to the victim as "Uncle Tony." He acknowledged that Mr. Brown had spent the entire weekend before the victim's death with the victim at his apartment, that the victim had dined with the Defendant and Mr. Brown on the night he was killed, and that there were no indications in the victim's and the Defendant's exchanged text messages that the two had argued.

- 3 -

Investigator Goetz further acknowledged that he learned that the victim had spent time in prison for aggravated kidnapping and was on parole at the time of his murder. He also learned that the Defendant had been trained as a law enforcement officer. He conceded that his own law enforcement training would lead him to shoot at the center mass "to eliminate the threat" of an individual who was advancing on him with a knife but on redirect examination testified that he could not envision any scenario in which his training "would instruct [him] . . . to attack someone from behind[.]"

Investigator Michael Reeves of the Lawrenceburg Police Department, a graduate of 80 hours of blood spatter training, including an "Advanced Blood Spatter Class," used crime scene photographs as he described in detail the blood spatter evidence at the scene, which included the void of blood behind the victim. He testified that approximately eight months after the murder, in early February 2016, he collected evidence that was found partially buried in a chert pit located behind the Defendant's trailer. Most of the items were found inside a plastic shopping bag. Among the items recovered were: an Austin Peay University red bag; a yellow and black hammer partially wrapped in a black latex glove; a black-handle kitchen knife; a white-handle kitchen knife; a "blackish gray lace throw over"; a white "I heart NY" t-shirt; a white and black leopard print shirt; a striped bath towel; and four empty pill bottles. Three of the pill bottles were prescriptions in the victim's name, all of which had been filled on April 27, 2015; a 120-count bottle of 30 milligrams of Oxycodone; a 45-count bottle of 350 milligrams of SOMA; and a 90-count bottle of 10 milligrams of Diazepam. The fourth bottle did not have a legible label but appeared to have contained a non-prescription medication.

On cross-examination, Investigator Reeves acknowledged that he had never been declared an expert witness in the area of blood spatter evidence. He further acknowledged that he had no proof that the victim's pill bottles were taken from the victim's apartment on the night of the killing. On redirect examination, he testified that when he accompanied Agent Wesson to the Defendant's home a day or two after the discovery of the victim's body, he noted a lot of "reddish clay mud substance" all over the Defendant's deck and footprints in the chert leading up the hill. He said the Defendant's explanation that day was that they had walked the dog in the area.

Captain Brent Hunter of the Lawrenceburg Police Department's criminal investigations division, who also had extensive training in blood spatter evidence, testified at length with respect to the blood spatter evidence, including what led him to conclude that an attempt had been made to clean the scene. Based on the appearance of the "wiped through" blood stains, he estimated that some of the blood had been on the floor for a minimum of twenty minutes before it was disturbed. On cross-examination, he acknowledged that the Defendant had not done a very good job of cleaning the scene but declined to opine whether that fact indicated that she was in a frightened or panicked

state. He acknowledged that the Defendant would have had to pass within an arm's length of the victim in order to exit the victim's bedroom.

Regina Hall, a physical therapist and the director of rehabilitation at National Health Care Corporation Lawrenceburg ("NHC"), a skilled nursing center, testified that the victim was admitted to their facility on April 14, 2015, following his hospitalization for pneumonia and atrial fibrillation, and discharged on April 26, 2015, when he reached his insurance coverage limit for in-patient rehabilitation treatment. At the time of his release, the victim could with difficulty stand unassisted from a seated or lying position, walk approximately 200 feet with his rolling walker, and walk down the hall with a straight cane using the hallway handrail for additional support. However, his balance was poor and his movements labored, so she recommended continued therapy on an out-patient basis.

Ms. Hall testified that victim returned to NHC on April 29 for an insurance-required assessment and reevaluation. After receiving insurance approval for outpatient therapy, the victim was scheduled for his first appointment on May 14, but he called to cancel because he was not feeling well. The victim also failed to show for his next scheduled appointment on May 18 but came in that afternoon after they called to check on him. The victim wanted to participate in therapy that day but was feeling unwell and unable to do so. His blood pressure was 168 over 82, and he reported that he had been to the cardiologist the previous week and learned that his irregular heart beat was causing his blood pressure to rise.

On cross-examination, Ms. Hall testified that the victim weighed over 300 pounds. She acknowledged that he scored as "independent" on his occupational therapy tests and had driven himself to his last therapy appointment. She testified that she knew that the victim had a reputation in the community for violence. Specifically, she knew that "[h]e had gone to prison because of murder." On redirect examination, she testified that she was currently 53, and the incident for which the victim went to prison occurred when she was "a little girl." At the time of his death, the victim "was charismatic and kind" and attended church.

Ashley Waller, a physical therapy assistant at NHC Lawrenceburg, testified that the victim came to the facility for outpatient therapy at 3:00 p.m. on May 18 after missing his 1:00 p.m. appointment. As he entered, the victim walked slowly while using a straight cane and holding onto the hallway railing. Upon his arrival at the gymnasium, he told her that he was feeling unwell and did not think he would be able to do therapy that day but wanted to try. After taking his blood pressure and finding it already somewhat elevated, she determined it would not be in his best interest to attempt therapy, as it did not "appear he would be able to do anything strenuous." Because he was unsteady on his

feet, she accompanied him back to his vehicle, and he left. On cross-examination, she acknowledged that the Defendant visited the victim on at least one occasion while he was an in-patient at the facility.

TBI Special Agent Forensic Scientist Charly Castelbuono, an expert in forensic biology, testified that she obtained only a limited, inconclusive DNA profile from the latex glove that was partially wrapped around the hammer. She explained that DNA degrades quickly from items that are exposed to the outdoor elements.

TBI Special Agent Forensic Scientist Dabney Kirk, an expert in latent print analysis, testified that she was unable to lift an identifiable print from any of the evidence submitted in the case.

Dr. Adele Lewis, the forensic pathologist who performed the autopsy of the 5'7", 315-pound victim's body, testified that the victim sustained at least twenty separate blunt force injuries to his head and torso, two sharp force injuries to his neck, and blunt force "bruising on his chest and on his tummy and some bruising on his arms." Part of the victim's right ear "had been cut off or hit off[,]" and there were multiple fractures of the face and skull, including "multiple broken bones on the skull on the right side, on the top of his head" as well as "multiple fractures of the bones around the eyes" and fractures of deep facial bones. The victim's neck had been cut in two places, with one of the cuts injuring the victim's thyroid and creating a significant hole in the victim's jugular vein. Bleeding, bruising and swelling had occurred in the victim's brain. Dr. Lewis estimated that it would have taken ten to fifteen minutes from the time the trauma began for the amount of swelling to occur in the victim's brain. She said that swelling would have stopped at the victim's death after his heart stopped pumping.

Dr. Lewis opined that the victim was still alive at the time the cut to his jugular vein occurred, based on the appearance of the wound and the amount of blood. She testified that it would have taken "a matter of a few minutes" for the victim to "bleed out," or bleed to death, from the cut in this jugular vein. In her opinion, the blunt force trauma she observed to the victim's body was consistent with having been caused by a weapon similar to the hammer found in the chert pit. Throughout her testimony, she used autopsy photographs to show the injuries she described, including a large "hinge" fracture of the victim's skull that was only visible after she lifted his scalp.

On cross-examination, Dr. Lewis agreed it was possible the victim was holding a weapon in his hand at the time his jugular vein was cut. She acknowledged that although she labeled the manner of death as homicide, she was unable to determine if the killing occurred in self-defense. On redirect examination, she testified that the blunt force

trauma that the victim sustained was so severe that she was "almost certain" that he would have been rendered unconscious.

Retired TBI Special Agent Wayne Wesson, who responded to the scene on the night the body was found, testified that he found no narcotics of any kind or any cash in the victim's apartment. A kitchen chair was underneath the working ceiling light fixture in the victim's bathroom and the victim's cell phone was inside the toilet bowl. Due to the length of time the phone was submerged, no data was recoverable. Inside the kitchen, he found a butcher block containing a set of white-handle kitchen knives that matched the bread knife that was found in the victim's right hand. In front of the knife stand was a bottle of "Mean Green," a cleaning fluid containing bleach. According to Agent Wesson, most law enforcement officers are aware that bleach completely destroys DNA.

Agent Wesson testified that he saw the Defendant that night at the crime scene. The next day, he and two other law enforcement officers talked to her at the trailer home she shared with her boyfriend, Jonathan Howell. At that time, one of the officers pointed out a trail of shoe prints leading from the trailer out into some deep mud. The Defendant answered his questions about the victim's habits and told him that she had not seen the victim since dining with him and Mr. Brown at the victim's home on May 18.

The following day, Agent Wesson and Investigator Goetz returned to the Defendant's home to talk to her again. Mr. Howell was at work, and the Defendant told Agent Wesson and Investigator Goetz that she had a few things to tell them that she had been unable to say the previous day in front of her boyfriend. She went on to inform them that she and the victim loved each other and had been involved in a romantic relationship that involved kissing and cuddling but in which no sexual intercourse occurred due to the victim's impotence. She said she went to the victim's home whenever she and Mr. Howell argued and that Mr. Howell was jealous of the victim. However, she did not believe that Mr. Howell would harm the victim and she reported that he would not have had the opportunity to do so.

During that same conversation, the Defendant also told the investigators about TBI discovery documents at the victim's home and mentioned a man named "Shawn Tierny," also known as "Big New York," as a potential suspect in the case. Agent Wesson testified that they followed up on the lead, but it led nowhere as Mr. Tierny was in North Carolina at the time of the killing. He said the Defendant came to the Lawrenceburg Police Department on May 22 to provide additional information about a man named "Damien," whose phone she claimed the victim used to communicate with Mr. Tierny. According to the Defendant, Mr. Tierny had threatened to kill the victim via a text message on Damien's phone. However, when investigators pursued that lead, they found no such threat on the phone.

Agent Wesson's next conversation with the Defendant took place on February 4, 2016, after he had eliminated all other potential suspects. He tracked her down, found her in jail in Giles County, and went to Giles County and sat down beside her when she was in the courtroom. Because he had something else to do that day, he told her he wanted to interview her but would return at another time. By coincidence, that same evening, he received a call from Carl Rawdon, who owned the trailer in which the Defendant formerly resided, about the items found in the chert pit. He therefore returned to Giles County to interview the Defendant that night. After waiving her rights, the Defendant provided three different, successive statements -- two that night and a third the following day.

In the first statement, the Defendant said she was in the victim's bathroom when Shane Hughes came to the apartment to argue with the victim about the victim's cutting him off from his pain pills. The Defendant said that she heard the two men fighting and then heard the victim cry out. When she came out of the bathroom, the victim was taking his last breath. The Defendant suggested that Mr. Hughes buried the evidence in the chert pit to frame the Defendant.

After Agent Wesson told the Defendant he did not believe her, she gave a second statement in which she claimed that Mr. Howell had accompanied her to the victim's home and gotten into an argument with the victim and killed him, despite the Defendant's attempts to stop him. The Defendant said she cleaned the crime scene and went home with Mr. Howell, where they buried the evidence, including the Defendant's blood-stained "I heart NY" t-shirt.

Based on the second statement, Agent Wesson interviewed Mr. Howell the next day and learned that the second statement was also a lie. He then returned to Giles County, where he took a final, third statement from the Defendant. In her final statement, the Defendant admitted that she had alone killed the victim but claimed it was in self-defense. The first part of the Defendant's signed written statement was handwritten by her and reads in pertinent part:

When I arrived back [at] [the victim's] after I dropped Josh [Brown] off at home on the 18th of May 2015 [the victim] asked me to go into the bedroom and help put away some laundry. I went into the bedroom (approx 10:30 p.m[.] May 18th). [The victim] followed behind me. He pushed me onto the floor and started yelling and waving a knife [at] me calling me a no good b****/whore and said to stay on the floor like the dog I was. He sat on his bed (while I was crying sitting on the floor). He said he knew that I was double crossing him by messing with his suppliers (David Dover) and taking his business from him. He also told me that he

had two "wise guys" on their way to get me and whack my b\*\*\*\* a\*\* and Jonathan [Howell] was next. He proceeded to pick up his phone indicating to me that the "wise guys" were being summoned. As I was thinking that I was surely gonna being [sic] killed I started looking around on the floor where I was sitting and saw a hammer laying under the bed. I quickly picked the hammer up and started swinging it. [The victim] fell back and gasped + yelped. All I could think was the "wise guys" were still coming. I started grabbing the evidence and tried to collect everything as I rushed out the door.

The last portion of the statement was handwritten by Agent Wesson but initialed and signed by the Defendant:

I threw [the victim's] phone in the toilet before I left. The knife in [the victim's] hand was placed there by me. I gathered things up and put them into bags and took them with me. I took wash rags, towels, hammer two knives and my clothes. I buried that stuff behind my old house . . .

I threw my shoes behind Hill Top Market. They were covered in red clay. I threw them there on the morning of the 19th of May.

No one helped me cover this up or helped me in any way. I did this alone.

When I hit [the victim] with the hammer he fell and dropped the knife in his hand. I picked up the small knife [the victim] had and stabbed him in the neck with it. I thought [the victim] was probably dead but I wanted to make sure.

I left [the victim's] and drove straight home. The next morning I got the stuff out of the truck and buried it. I took some bleach and water on a cloth and washed out the back of the truck.

I told [Mr. Howell] about this months later.

The statement also included the following handwritten notation in the margin, signed by the Defendant: "One of the knives I used to dig a hole with. The other came from [the victim's]. The black one is the one I stabbed [the victim] with."

Agent Wesson testified that the Defendant told him during her previous statement in which she blamed the killing on Mr. Howell that she had sent text messages to the

victim's phone on the day after the killing in order to cover her involvement. During the course of his investigation, he was able to confirm that she had sent two text messages to the victim's phone after the victim's death.

On cross-examination, Agent Wesson acknowledged that he did not uncover any evidence that the Defendant had previously threatened the victim or that anything unusual had occurred in their relationship prior to the night of the killing. He further acknowledged that the victim had a reputation in the community for violence. Specifically, he was aware that the victim had been sentenced to the federal penitentiary in 1982 for two counts of kidnapping and was on parole for those crimes at the time of his death.

### Defendant's Proof

Carl Rawdon, a friend of the victim and the owner of the trailer in which the Defendant lived at the time of the victim's death, testified that the victim paid the Defendant's $300 per month rent on the trailer for three months, making the last payment in April 2015. On cross-examination, he acknowledged that the victim "was crazy about [the Defendant.]"

Kathy Yates, the manager of the victim's apartment complex, testified that in the last few weeks of his life, the victim was ambulatory and able to drive his vehicle.

Misty McMasters, the Defendant's sister, testified that the victim made regular $200 payments to her on the Defendant's behalf in repayment of a loan she had made to the Defendant. She said on two occasions when she was dining out with the Defendant, the victim sent the Defendant threatening text messages demanding that she come to his apartment immediately. Each time, the Defendant got up and left the restaurant, telling Ms. McMasters that she was frightened of the victim. Ms. McMasters testified that she was aware of the victim's reputation for violence, having heard that he had murdered someone in the past.

On cross-examination, Ms. McMasters testified that the victim's threatening text messages consisted of his telling the Defendant that he would come and "hunt [the Defendant] down" if she did not come to him immediately. She acknowledged having told Agent Wesson that the Defendant was on drugs at the time of the victim's murder but would not concede having said that law enforcement should investigate the Defendant as a suspect. She said she did not know if the Defendant and the victim were involved in an intimate relationship.

- 10 -

T.B., the Defendant's daughter, who was 16 years old at the time of trial, testified that she once heard the victim, who was sitting in his living room, curse at the Defendant, who was in the kitchen, and threaten to kill her with his pen. On another occasion when the victim was driving T.B., T.B.'s friend, and the Defendant to dinner, the victim and the Defendant began arguing about money and drugs, and the victim threatened to drive his car off the road. According to T.B., the victim boasted to her more than once about having kidnapped and murdered someone and buried the vehicle used in the crime.

On cross-examination, T.B. testified that the victim's threat to kill the Defendant with his pen occurred when T.B. was in the seventh grade, and his threat to drive his vehicle off the road occurred when she was in the eighth grade. She agreed that the victim regularly gave gifts to the Defendant and her children and paid for the family's outings. She testified that the victim never physically struck or harmed the Defendant or her children.

Shane Hughes, a friend of the victim, agreed that he once helped the victim assemble a bed, using the witness's hammer. He did not, however, recognize the hammer found at the chert pit and had never seen it in the victim's home. He testified that on at least two occasions he helped the victim with his "pill count" by providing him with some of his own Oxycodone to make up a shortfall. He also, on at least four or five occasions, wired money via Western Union on the victim's behalf to a woman in another state, who he later learned was Mr. Tierny's girlfriend. To his knowledge, the victim and the Defendant were just friends, although the victim would have liked a more intimate relationship. Mr. Hughes stated that the victim frequently became angry with the Defendant and about six months before his death made the comment, "If I get that b**** in the right place one of these days, I might just have to kill her." The victim also said he was going to have to keep the Defendant "on a short leash."

On cross-examination, Mr. Hughes was adamant that the victim never asked him to kill anyone and said if the victim called him on the night of May 18, 2015, it was about a different matter. He agreed that the victim was "a blowhard" and testified that he did not believe the Defendant was in danger when the victim made the comment about having to kill her one day. On redirect examination, he testified that he learned after the victim's death that the victim had been "dealing in prescription pills to a pretty good level."

The Defendant testified that she met the victim through her boyfriend, Jonathan Howell, who was addicted to prescription pain pills and began selling for the victim in order to finance his habit. She said she initially sold pills with Mr. Howell, but over time the victim realized that she was more capable than Mr. Howell, and she began selling for the victim by herself. She estimated that she sold pills for the victim for approximately

two years. During that time, she and the victim became very close and she grew to love him deeply, although they were "not intimate."

The Defendant explained the victim's prescription pill business and how he enlisted the aid of a nurse practitioner and pharmacist to obtain prescriptions and pills. She said Shawn Tierny came each month to Lawrenceburg to get prescriptions refilled, and she and the victim would meet him at the pharmacy to take possession of the pills. The victim also had another minor pill supplier, "Daisy," whose primary role was to supply the victim with marijuana. Because of the Defendant's role in selling pills, it was not uncommon for her to have prescription pills of the victim's in her possession. In fact, each month she helped ensure that the victim's pill count was correct before the victim's parole officer made his monthly visit of inspection to the victim's apartment.

The Defendant testified that she once asked the victim to explain the story she had heard about the victim's having murdered someone. She said the victim proudly related how he had set up a man who was selling fake silver by purchasing $30,000 of the fake silver from him. After the purchase, the victim called his "gangster" friends and announced that they were "gonna whack this guy." The victim, with his accomplices, then kidnapped the man and his pregnant wife at gunpoint, stowed the wife in a storage shed, shot the husband in the head, and buried the Cadillac in which the murder occurred in one location and the husband in another location. The Defendant said the victim let the wife go without harming her because she was pregnant. She testified that the victim was convicted of two counts of aggravated kidnapping, was sentenced to 70 years in prison, and was released on parole after serving 29 years and seven months.

The Defendant related the circumstances surrounding her killing of the victim as follows: The victim picked up Chinese food, which he shared with the Defendant and her son at his apartment. He then told the Defendant to take Mr. Brown home because he was about to transact a big drug deal. When the Defendant returned to the victim's apartment, he told her to put up the laundry that was in his bedroom. She started into the bedroom and the victim struck her from behind, knocking her to the floor beside his bed. When she started to get up, the victim said to her, "B****, you better stay on the ground like the dog you are." She asked the victim why, and he accused her of trying to send him back to jail. He also threatened the lives of herself and her children, saying, "I've got some wise guys coming to get you. Your kids are gonna watch me kill you, and then I'm gonna kill them and throw your bodies in a []hole. No one will ever find y'all." The victim was wearing a white t-shirt and took it off and threw it at her, saying, "I'm not gonna get blood on that shirt, b****. You're not worth it. . . . And that candle that is burning, I'll say a prayer when you're passed, when you're dead and gone."

The Defendant testified that the victim was standing over her with a knife at this time. She said that she started looking around for something to throw at him and spotted a hammer underneath the bed. When the victim turned to sit on the bed in order to call his "wise guys," she saw her opportunity, grabbed the hammer, and "flew across the bed and started hitting him." She stated that she remembered hitting the victim only two or three times but realized from the evidence that she must have hit him many more times. She said that her hammer flew out of her hands at one point. His knife slipped, and she grabbed it and stabbed him because he was still fighting, and she had no weapon. Afterwards, she went out to her vehicle, retrieved a bag and a pair of latex gloves that Mr. Howell had in the vehicle because he used them in his line of work, returned to the apartment, cleaned up, threw the victim's phone in the toilet, planted a different knife in the victim's hands, gathered up the evidence, and went home. The next day, she buried the evidence in the chert pit. She explained her actions in concealing the evidence by saying that she was panicked and frightened of going to jail for her role in the drug business. She was also still frightened for the lives of herself and her children because of the victim's "wise guy" friends.

On cross-examination, the Defendant claimed that the portion of her written statement about having stabbed the victim to be sure he was dead, which was not in her handwriting, was fabricated by Agent Wesson. She said the portion about the victim falling back onto the bed after she hit him with the hammer was not accurate and that what really occurred was that he started swinging at her with his knife, cutting her hand. She acknowledged that she signed the statement but said she did not read it before signing it.

Retired FBI Agent Richard Knudsen testified that he investigated a matter in the late 1970s/early 1980s that resulted in the victim's conviction on two counts of aggravated kidnapping, for which he received a 70 year prison sentence. The victim was never charged with murder, but his investigation led him to conclude that the victim had committed a murder in connection with the case. According to Agent Knudsen, the victim's reputation in the community was as an "extremely dangerous and violent" man. His own personal opinion was that the victim was "dangerous, threatening, [and] menacing."

Agent Wesson, recalled by the State, denied having fabricated any portion of the Defendant's statement to police.

Following deliberations, the jury found the Defendant guilty of first degree premeditated murder and not guilty of theft of property and first degree felony murder. She was subsequently sentenced to life imprisonment for the first degree murder

conviction, to be served concurrently to a three year sentence for tampering with evidence.

## ANALYSIS

### I. Victim's Violent Felonies and Threats to FBI Agent and His Family

As her first two issues, the Defendant contends that the trial court abused its discretion in excluding testimony by Retired FBI Agent Knudsen of the facts surrounding the victim's aggravated kidnapping convictions and of the victim's having taken out an "open contract" on the agent and his family.

In a jury-out hearing, Agent Knudsen testified that he was the case agent in the victim's aggravated kidnapping case. He described the facts surrounding the crimes, which were essentially the same as those recounted by the Defendant during her testimony, with the exception that, according to Agent Knudsen, the victim had tried to find someone to kill the pregnant wife before he ultimately let her go. Agent Knudsen testified that during the prosecution of the case, he learned through a prison informant that the victim had put out an "open contract," seeking someone to kill either him or one of the witnesses in the case. He said he had three small daughters at the time, so "obviously it impacted [his] family." Because he believed the victim had the money and contacts to carry out the threat, he even considered moving with his family to a different location to keep them safe. He stated that he confronted the victim during one of the victim's court proceedings, telling him that he had just been doing his job and asking him to "pull that contract back." He said the victim did not reply and "just g[o]t red like he was either embarrassed or mad."

At the conclusion of the hearing, the trial court found that the probative value of the specific acts of violence was substantially outweighed by the danger of unfair prejudice. The court further found that the threats communicated to the agent were so remote as to be irrelevant and constituted hearsay for which the Defendant had not shown a valid exception. Accordingly, the trial court ruled that Agent Knudsen could testify about the victim's reputation in the community for violence but would not be allowed to testify about the threats made against the agent in 1981 or the facts surrounding the victim's decades-old crimes. The court reserved, pending the proof presented at trial, whether the Agent Knudsen would be allowed to tell the jury what the victim had been convicted of or that the victim was on parole at the time he was killed.

Following the Defendant's trial testimony, the court ruled that Agent Knudsen could testify about the victim's convictions, the length of his sentence, and the victim's parole status, but could not get into the underlying facts of the crimes. After further argument of counsel, the court later expanded its ruling to allow defense counsel to inquire into whether the agent believed, based on his investigation, that the victim had committed a murder in connection with the kidnapping.

On appeal, the Defendant argues that Agent Knudsen's testimony about the victim's violent acts should have been admitted to corroborate the Defendant's claim that the victim was the first aggressor. She argues that Agent Knudsen's testimony about the victim's threats to the agent and the agent's belief that the victim had associates capable of carrying out the threat would have corroborated the Defendant's testimony and bolstered her claim that she acted in genuine fear of the victim's "wise guy" associates. The State responds that Agent Knudsen's testimony about having heard that the victim had put out an open contract on his life was inadmissible hearsay, and the details of the victim's crimes were inadmissible under Tennessee Rule of Evidence 405.

We, first, agree with the State that what Agent Knudsen heard about the victim's advertising for someone to kill the agent constituted inadmissible hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Agent Knudsen's proffered testimony made it clear that the threats were communicated to him by a prison informant and never acknowledged by the victim. As such, we conclude that the evidence was properly excluded by the trial court.

As for whether the trial court properly excluded the proffered testimony about the prior violent acts, we note that both parties analyze the issue pursuant to Tennessee Rule of Evidence 405, "Methods of proving character," which provides that after evidence has been presented of a person's character trait by reputation or opinion testimony, inquiry may be allowed on cross-examination "into relevant specific instances of conduct" if certain conditions are met. See Tenn. R. Evid. 405(a). However, as explained in Tennessee Law of Evidence:

> Victim's Prior Violent Acts. Since the adoption of the Tennessee Rules of Evidence, some appellate decisions have held that if the issue of who was the first aggressor is raised by the evidence (as opposed to by the arguments of counsel), proof of the victim's prior violent acts is admissible to corroborate the defendant's claim of self-defense. These prior acts may have involved the victim's assaults on people other than the defendant. It must be stressed that this use of the victim's prior acts is not covered by Rule 404(a)(2), which deals with substantive rather than corroborative proof.

Since Rule 404(a)(2) does not apply to the corroborative use of evidence of the victim's prior violent acts, Rules 405(a) and (b) also do not appear to apply. This means that the usual rule that specific acts may be use[d] only on cross-examination apparently is not applicable. Accordingly, in a criminal case where there is some evidence suggesting that the victim was the first aggressor, the defendant may offer proof of the victim's prior violent acts with third persons. Such proof may be presented on direct examination.

Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[5][d] (6th ed. 2011).

Regardless of whether Rule 405 applies, "evidence [of the victim's prior acts in support of a defendant's claim of self-defense in a case where first aggressor has been raised by the proof] is 'at minimum, subject to the balancing test set forth in Tennessee Rule of Evidence 403.'" State v. Samuel Sherrill, No. M2009-01979-CCA-R3-CD, 2011 WL 1564009, at *7 (Tenn. Crim. App. Apr. 21, 2011), perm. app. denied (Tenn. Aug. 26, 2011) (quoting State v. Marquette Houston, No. W2006-00095-CCA-R3-CD, 2007 WL 1890650, at *8 (Tenn. Crim. App. June 29, 2007), perm. app. denied (Tenn. Nov. 19, 2007)).

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. All relevant evidence, subject to certain exceptions, is generally admissible under Rule 402 of the Tennessee Rules of Evidence. Relevant evidence may be excluded under Rule 403, however, if "its probative value is substantially outweighed by the danger of unfair prejudice[.]" Tenn. R. Evid. 403.

Questions regarding the relevancy of evidence lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)).

Evidence of the victim's prior bad acts involved in his kidnapping convictions was arguably relevant to support the Defendant's claim that the victim was the first aggressor and that she acted in self-defense. Whether the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, however, is a much closer question. On the one hand, the prior bad acts involved kidnappings and a murder that was allegedly committed in retaliation for the victim's having been wronged in a criminal enterprise, which would tend to bolster the Defendant's claim that the victim attacked her

- 16 -

because he believed she was cutting him out of the drug transactions. On the other hand, the victim's crimes were committed not just years, but decades earlier. Given the great length of time since the events, we can find no abuse of discretion in the trial court's exclusion of the evidence on the basis that its probative effect was substantially outweighed by the danger of unfair prejudice. Cf. Samuel Sherrill, 2011 WL 1564009, at *7-8 (concluding that the trial court committed harmless error in excluding evidence of victim's prior bad acts that occurred approximately three and four years before the victim's death).

Even if we agreed with the Defendant that the testimony about the specific bad acts of the victim should have been admitted, we would have no hesitation in concluding that the proof against the Defendant was so overwhelming that any error in excluding the testimony was harmless beyond a reasonable doubt. The proof in this case was that the victim, at the time of his death, was a morbidly obese, elderly man experiencing heart problems who had just been released from a nursing facility and who had to use a rolling walker or a cane to ambulate. The proof also showed that the victim was struck from behind in the back of his head and that the knife found in his hand was planted there by the Defendant after his death. Moreover, multiple witnesses, including the retired FBI agent, were allowed to testify that the victim had been convicted of aggravated kidnapping, which involved a murder, and that he was on parole at the time of his death. We, therefore, conclude that the trial court properly excluded the agent's proposed testimony of the facts surrounding the victim's convictions and the victim's alleged threat to the agent's life.

## II. Special Jury Instruction

The Defendant next contends that the trial court erred by granting the State's request for a special jury instruction regarding the victim's having become "disarmed or helpless" during the killing. Specifically, the Defendant complains of the following sentence that the trial court inserted at the end of a paragraph about when the use of force against a "first aggressor" victim would no longer be justified: "If the deceased had become disarmed or helpless, or all danger to the defendant had disappeared, then the defendant's right to self-defense would not justify her further use of force." The requested sentence was part of the pattern jury instruction on self-defense prior to 2007 but was not included in the 2007 amendments to the instruction. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 40.06(b).

The Defendant argues that the deletion of the sentence from the pattern jury instructions indicates that the sentence is not a correct statement of the law and that its inclusion therefore prejudiced her right to a fair trial by undermining her defense theory of self-defense. She asserts that "[j]ust because an alleged victim becomes 'disarmed or

helpless' during an encounter does not automatically mean that a defendant's right to self-defense would not justify any further use of force." In support, she cites evidence of the victim's immense size and his threat of harm to her and her children at the hands of his criminal "wise guy" associates.

The State argues, among other things, that the language inserted by the trial court is still an accurate statement of Tennessee law, which has long held that there must be a threat of imminent harm or death at the time of the killing in order to justify a killing in self-defense. As such, the State responds to the Defendant's claim about the threat posed by the victim's alleged "wise guys" by arguing that it was not the sort of immediate or imminent threat that would excuse the Defendant's actions in killing the victim. We agree with the State.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). Tennessee law does not mandate that any particular jury instructions, or "pattern instructions," be given so long as the trial court gives a complete charge on the applicable law. See State v. James, 315 S.W.3d 440, 446 (Tenn. 2010); State v. West, 844 S.W.2d 144, 151 (Tenn. 1992). An instruction will be considered prejudicially erroneous only if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)).

The pattern jury instructions are not controlling. See James, 315 S.W.3d at 446 ("Trial courts are not limited to the mere recitation of the pattern instructions.") (citation omitted); State v. Hodges, 944 S.W.2d 346, 354 (Tenn. 1997) ("[P]attern jury instructions are not officially approved by this Court or by the General Assembly and should be used only after careful analysis. They are merely patterns or suggestions.").

When considering this issue, the trial court noted that the preface to the pattern jury instructions states that the pattern instructions "are not intended to provide instructions applicable without change to every case" and instead "are meant to provide judges and lawyers with models of instructions designed to aid in juror comprehension." See T.P.I.-Crim. Preface. The court also noted the evidence in the case that the victim was still alive at the time the cut to the jugular vein was made, along with the Defendant's contradictory accounts in her statement and during her trial testimony about

the victim's condition at the time she stabbed him. Finally, the court observed that this court has cited the challenged language either with approval or without negative comment in cases that were tried after the change to the pattern jury instructions. See State v. Mark Hines, No. W2009-00450-CCA-R3-CD, 2010 WL 4286132, at *11 (Tenn. Crim. App. Oct. 27, 2010), perm. app. denied (Tenn. Apr. 14, 2011); State v. Anthony Eugene Poole, No. M2010-01179-CCA-R3-CD, 2012 WL 826605, at *5-7 (Tenn. Crim. App. Mar. 9, 2012), perm. app. denied (Tenn. Aug. 16, 2012).

A trial court's denial of a request for special jury instructions is error only when the trial court's charge does not fully and fairly state the applicable law. State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001). Given the evidence in this case, we conclude that the trial court did not err in granting the State's request for the special jury instruction at issue.

### III. Crime Scene and Autopsy Photographs

The Defendant next contends that the trial court erred by admitting eight unfairly prejudicial crime scene and autopsy photographs. She argues that the medical examiner's testimony and autopsy report were more than adequate to describe the extent of the victim's injuries without admission of the inflammatory autopsy photographs. Similarly, she argues that testimonial evidence provided by the officers who responded to the crime scene was sufficient to describe for the jury the location of the blood spatter, the body, and the apartment layout without the admission of gruesome crime scene photographs.

The admissibility of photographs generally lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing that the trial court abused its discretion. Faulkner, 154 S.W.3d at 67; State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases." State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000). In determining whether a photograph is admissible, the trial court must first determine whether it is relevant to a matter at issue in the case. See Tenn. R. Evid. 401; Vann, 976 S.W.2d at 102; Banks, 564 S.W.2d at 949. The court must next consider whether the probative value of the photograph is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403.

In a pretrial hearing, the trial court carefully reviewed a large number of crime scene and autopsy photographs before ruling on each one's admissibility. The court excluded some of the photographs as cumulative and others as too graphic or unnecessary. The court admitted the eight photographs at issue on the grounds that they

were relevant to issues at trial and their probative value was not substantially outweighed by the danger of unfair prejudice.

We find no abuse of discretion in the trial court's admission of the photographs. Four of the photographs are crime scene photographs that show: the victim's body lying across the bed with blood spatter on the bed and wall beside him; a closer view of the torso showing the cuts to the neck and blood around the shoulder and neck area; another view of the body showing the lack of blood spatter in the area around the chest of drawers behind the victim's head; and a view of the large pool of blood that formed beneath the victim's body.

The four autopsy photographs consist of: two views of the cleaned-up victim's head showing the wounds to his eyes and top of his head; a view of the victim's cleaned torso and head showing the bruises and wounds to his arms and the top of his hand; and a very clinical-appearing view, with the scalp apparently pulled back but not visible, of the indentation or caved-in portion on the top of the victim's skull. Although not pleasant, none of the photographs are unduly gruesome. In our view, they were relevant and admissible to support the State's position that the victim was struck from behind and was still alive and bleeding at the time his throat was cut. We, therefore, conclude that the trial court properly admitted the photographs.

## IV. Sufficiency of the Evidence

Lastly, the Defendant contends that the evidence is insufficient to sustain her first degree murder conviction, arguing that the proof failed to establish that she acted with premeditation when she killed the victim. In support, she cites, among other things, the victim's imposing size, the victim's violent history and reputation in the community for violence, the State's failure to show a motive for the crime, and her own testimony about the victim's having threatened her and her children with a knife and with his criminal "wise guys" associates. The State argues that evidence of the Defendant's premeditation was overwhelming, and the jury was well within its province to disbelieve her claim of self-defense. We agree with the State.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R.

App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

For the purposes of this case, first degree murder is defined as "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) "Premeditation" is

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

- 21 -

The "element of premeditation is a question of fact" for the jury to determine based upon a consideration of all the evidence. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)). "[P]remeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment' as required by Tennessee Code Annotated section 39-13-202(d)." State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003). A jury may infer premeditation from circumstantial evidence surrounding the crime. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). There are several factors which our courts have concluded may be evidence of premeditation: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing." Bland, 958 S.W.2d at 660. An additional factor from which a jury may infer premeditation is evidence establishing a motive for the killing. See State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998). Motive, however, is not a required element of the crime. See State v. Bell, 512 S.W.3d 167, 191 (Tenn. 2015).

The Defendant first argues that the evidence supports her claim that she acted in self-defense when she killed the victim. In support, she relies primarily on her own testimony about the victim's actions and threats, along with the victim's violent criminal history in association with "gangster" associates. Tennessee Code Annotated section 39-11-611, the self-defense statute, provides that the use of force, including deadly force, may be justified when a person has a reasonable belief that there is an imminent danger of death or serious bodily injury. Tenn. Code Ann. § 39-11-611(b)(2)(A). Whether a defendant acted in self-defense is a question of fact for the jury to determine. See State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App.1994); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993).

The jury heard the testimony of the Defendant about her knowledge of the victim's past, the victim's character, and the victim's violent behavior and threats to her life on the night of the killing. The jury also heard testimony of various other witnesses about the victim's reputation in the community for violence, his violent and criminal character, and his history of violent crime. Despite this testimony, the jury convicted the Defendant of the first degree premeditated murder of the victim, evidencing that it did not find the Defendant's claim of self-defense credible. This was its prerogative as the trier of fact.

The Defendant argues that even if the evidence does not support her defense of self-defense, it also does not show that she was sufficiently free from passion and

excitement to be capable of forming premeditation at the time of the killing. In support, she cites the State's failure to prove a motive for the crime, as evidenced by the jury's acquitting her of the theft and felony murder counts of the indictment. She also again cites her testimony about the victim's having cornered her on the floor of his bedroom and threatened her life with a knife.

We conclude, however, that the evidence was sufficient for the jury to find that the Defendant acted with premeditation in her killing of the victim. When viewed in the light most favorable to the State, the proof establishes that the 35-year-old Defendant struck the 69-year-old morbidly obese, semi-invalid victim from behind with a severe blow to the top of the head with a hammer, beat him savagely about the head and torso with the hammer, cut his jugular vein with a knife after he was rendered unconscious by the blows to his head, planted a weapon in his dead hand, cleaned the scene using latex gloves she brought with her and a bleach cleanser, removed and buried evidence, and purposefully misdirected law officers in their investigation. From all of this evidence, a rational jury could have found beyond a reasonable doubt that the Defendant committed a premeditated and intentional killing of the victim. Accordingly, we affirm the Defendant's conviction for first degree premeditated murder.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE